# CASE 15 cv 1101,

## Olaniyan Adefumi's Response to Judge Ditter's Position

### First

There are a few reasons why I disagree with Judge Ditter's position of the case I have against the work of Dr. Sharon Lim.

Some of the problem is the use of various words. On page two we see the words "asked" and "instructed." She did not ask me to remove any clothing nor did she instructed me to remove any of my clothing. She, on the other hand, told me to remove my pants and when I refused and only removed one pants she screamed the ghetto sentence fragment "the underpants too."

### Second

We can see the use of the term "a reasonable jury." This is a variable because one person's belief of what is a reasonable jury may variate from what another person believes to be a reasonable jury.

### Third

On page five we see the word "robe." I did not know that the doctor's inventory included a robe or if the operation she was about to give required that I was to be unrobed with my two-part pants set removed.

1

## Fourth

I did not know that I would prefer a male doctor because the female doctor did not inform me of the future and nearby procedures that would include her touching and seeing my sex organs and my nudity. So, I did not ask for a male physician's services. Also, I did not know of the availability of a male doctor. This was not "informed consent" but it was "uninformed consent."

## Fifth

On page six we can read "he did not notify her of any negative feelings at the time of the examination, either implicitly or explicitly." Trying to communicate was killed when she screamed "the underpants too!" Obviously, she screamed that sentence fragment after I had refused to remove my underpants. Moreover, I did not want to remove both pants only to later hear her tell me 'I did not mean to remove both pants.' So, I moved conservatively and refused her, as musician Fela Anikulapo Kuti said, "Foolish Liberal," ideals. Some evidence of her inability to see were exposed when her student, Mr. Semenetz, stated the pants were removed as she said that they were only lowered and the evaluation lasted for less than one minute. It was impossible for it to last about one minute, or less than that amount of time, as she, according to her deposition, palpated the rash.

As she palpated the rash her mouth often was about ten to fourteen inches from my penis. Her student, who was confused to the point that he thought, during depositions, that the difference between lowing and removing one's pants is a matter of semantics, stated that her mouth, when she palpated Mr. Adefumi's private area, was twenty-one inches from his penis. Moreover, it takes more than one minute to palpate a rash on the upper-inside part of one's left leg.

### Sixth

Further proof of there not being a need to communicate to her was how she slapped my penis. There is no evidence that I stated that she repetitively "slapped" my penis. An attorney for the doctor, Attorney Cooper, reported on page five of his report that I claimed that she slapped my penis for a number, greater than twenty, minutes. That the judge accepted this information as being what I reported shows the bias approach of the judge to believe the attorney without seeing, I assume, my previous report named "Exposed and the Underpants too." There, I reported the one time that she slapped my penis. How did this get to be exaggerated to being twenty-eight to thirty-eight minutes of slapping my penis? This brings many to face the question of what happened to Emmitt Till's penis. First a group of either intelligent and/or non-intelligent men had to jump to a "crazy conclusion" that he tried to sexually attack a female. Much later she confessed that the boy did not try to attack her. His penis was found in the river where they left his dead body. We also know that many times when a Black male was hung his penis was taken away as a souvenir. Judge Clarence Thompson on October 11, 1991 called certain acts about his sexuality as a "high-tech lynching…." When doctors come into the Black neighborhoods they should be aware of this history and learn that speaking "ghetto talk" is not a permission that gives one a right to touch one's penis.

On page seven Judge Ditter tells us that Mr. Adefumi did not object during the operation. It is obvious that to do so was dangerous. He showed this previously on page five and six where he stated that I believed that the doctor knew what she was doing and it could get me killed if I objected to her demands. Later, at the University of Pennsylvania Pearlman Hall on November 11, 2017, medical school students and teachers discussed the facts that many doctors could not tell when many Black patients where discomforted.

I had a stiff right shoulder area that included much of my head's area behind and below my right ear. This had last for weeks. I rarely miss work but took off to have it addressed. Then some of Health Center Five personnel told me to wait in the line, where people stood, or return on November 19, 2014. Waiting appeared to be too painful so I went home and returned on November 19, 2014. On that November date I had not only the same constant shoulder-head ache but now a leg rash. I was in too much pain to talk or argue with a female doctor who screamed "the underpants too."

Here, no one noticed the extreme pain that I felt but myself. The patient advocate did not notice it, the two city solicitors for the doctor did not make a verbal acknowledgement of this, and Judge Dillion did not make a notice of this. Many people at Pearlman Hall noticed this pattern and see that Black people feel pain when many people cannot see that the patient/s is/are in pain. Also, verbal details of the Patient's Bill of rights were not used. The judge reports a few times, see pages six, seven, and once more on page seven, that I did not complain and thus believes I should of risked going to jail, etc. Again, my instincts told me that death and violence was near where I was situated where like with Emmitt Till I was naked which included not wearing my pants and underpants too, as my instincts told me that death and violence was very near where I was situated. So I remained quiet rather than help to make things worse.

### Seventh

On page twenty of the book "Doctors Talking with Patient/ Patients Talking with Doctors Improving communication in the Medical Visits, Second Edition, we can read from page twenty, fifty-seven, and one hundred and three some very interesting things.

#### Page Twenty

One reason why people conform to the roles they are case in is the practically mortal fear of committing social improprieties. This is especially pertinent to the patient role, which traditionally has been a rather passive one. We believe it is often a dread of being inappropriate, of doing the "wrong" thing, that prevents patients from offering their opinions, asking questions, or asking their doctors to show them their medical charts, even when such actions are clearly in the patients' best interest. Patients feel they are not supposed to do these things……………….

Roles, after all, are just a kind of conformity, not a moral code or rule of law.

#### Page Fifty-Seven

Waitzkin suggests that physicians may not be attuned to the nonverbal signals of working-class patients and may easily miss or misinterpret patients request for information or clues of distress.

5

Page One Hundred and Three

Moreover, while female patients are more likely to choose female physicians than male patients, both male and female patients overwhelmingly choose male physicians Schmittdiel, Grumback, Selby, & Quesenberry, 2000). A preference for same-gender physician, however, is much stronger when patients are seeking help for intimate health problems, including gynecological and obstetrical care (Elstad, 1994; Pearse, 1994; Weisman & Teitelbaum, 1989). These preferences have been linked to an expectation of special insight and experience with gender-specific problems and embarrassment and discomfort associated with physical exposure and discussion of sensitive matters across gender lines.

The effectiveness of the rash treatment is irrelevant because the rash conditions and the neck conditions returned. This is true even though Attorney Cooper states that I was cured of the problem. On Christmas Day of 2014 Dr. Ufberg of Temple University Hospital solved the problems. Before that I felt what seemed to be blood rushing from my shoulder to my heart and from my heart to my shoulder, continuously. Not wanting to go this way I went to the hospital before daybreak. He told me that it was simply my muscles relaxing and he did not need to palpate my rash, groin, penis, or any body part. Moreover, he provided a gown without it being requested. At Hahnemann Hospital patients are not give an option to not wear a gown even in the psychology Department.

No, requesting a medical examination does not equal accepting all conditions of a medical examination before they are itemized. "Uninformed consent" is when a patient was not given information of a future procedure. Hospital actions are science. Here, the different procedures or styles of two doctors are to produce the same results. Having a male show his penis, etc., to a female is not gone to always be the same medical treatment or give the same medical results. A doctor does not need to be a psychologist to know that and Dr. Lim reported in depositions she knew of problems many males have with exposing their genitals to a female medical doctor. Moreover, had she asked what activities I do she would have learned that bicycling on a bicycle may be done with a tire rub which could produce a rash and using a bad pillow could of caused the shoulder-neck injury. Thus, medicine, here, equaled fixing the bicycle and buying a bigger and better pillow.

### Eighth

On page eight and nine we can see the words "reasonable" and on pages eight and nine we see the words "shocks" and "palpated."

A word like "reasonable" changes from being understood to being not understood depending on what one determines to be "reasonable." The doctor is to find out what does the patient see as being "reasonable" and not "jump to conclusions" that an opposite sex female patient will not have a problem with exposing her vagina, etc., to a male doctor when her chest, buttocks, legs, etc., are naked. There "informed consent" did not reach her from one or more "assumptions." It is to be verbalized to her just as it is to be verbalized to a male when his sex organ/s is/are to be visualized and/or touched by a doctor of his opposite sex. Not to do so is "unreasonable" and a reasonable panel, like a jury, of attorneys found Dr. Lim's activities to be wrong. Without "informed consent" the doctor's conduct "shocks the conscience."

On page nine Judge Ditter tells us that "when the state actor knows what 'he' is doing may cause harm but does it anyway ….." this also applies to the state actor who is "female."  Dr. Lim reported during depositions that she knew of the problems many males have of being seen nude in their sexual parts by a female medical worker but, there, she also reported that she did not know what is penis envy.

Dr. Lim told us that the act took less than one minute but on page nine Judge Ditter stated that she palpated the rash.  Thus the body rash was touched for much more time than one minute, or less than one minute according to Attorney Cooper, and the Pennsylvania Human Relations Commission found that she used twenty minutes to treat my problems.

### Ninth

Judge Ditter addresses "Qualified Immunity" on page nine.  Dr. Lim "would have known" that her actions were wrong.  There are many records of patients being abused sexually and being filmed by doctor's cameras that were placed in rooms and/or toilets.  A large portion of those who did these acts later attempted suicide which shows that the patients were the doctor's medication.  Also, patients should be informed of this "qualified immunity" before she or he is to be seen, nude.  Moreover, "qualified immunity" should not be something that removes the need of "informed consent" and patients should be informed of the qualified immunity limitation before any medical procedure begins.

A reasonable panel of attorneys found the doctor to be wrong.  Dr. Lim knew she violated my "Patients' Bill of Rights, and more.

## Ten

In conclusion, I have shown that a fact finder would conclude that Dr. Lim's actions violated rights of Mr. Adefumi and that Dr. Lim's actions were culturally shocking. Again, she did not ask me to lower or remove my pants but told me to do that and she could have used a robe on me but decided not to give me information of the availability of a robe. Robes, according to a 2015 report given by Health Center Number Five to the Pennsylvania Human Relations Commission, are for those who know to ask for one and for those who the doctor decides to give one otherwise they are not to be given to patients. This is a form of "uninformed consent."

She, Dr. Lim, claimed that her work on Mr. Adefumi's leg took less than one minute. Yet, she had time to palpate the leg's rash within that time frame which included me removing all of my clothing but my socks. Her student, Mr. Semenetz stated on January 6, 2015, that the pants, including the underpants, had to be removed in order for the doctor to do her work then about seven months later he changed his words to being ones that he used to state that the pants never left Mr. Adefumi's body. Dr. Lim even slapped Mr. Adefumi's penis and did not know what is penis envy but Attorney Cooper tried to help by exaggerating Mr. Adefumi's report as being something that includes that Dr. Lim slapped his penis for twenty-eight to thirty-eight minutes and even with that being done she has qualified immunity that protects government workers who do that. Another attorney of her team, Attorney Prosper, tried to help the doctor by stating that she investigated and found out that Mr. Adefumi attempted to deliver a court notice to Dr. Lim. Yet, during depositions, Dr. Lim stated that Mr. Adefumi did not attempt to deliver a court notice to her.

Therefore, this case must be seen by others, who like the panel of attorneys, see that the doctor's actions were wrong.